296 F.2d 645
 Lloyd M. JOSHEL and Suzanne W. Joshel, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Carmin R. NELSON and Mary E. Nelson, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Robert L. SILBER and Helen F. Silber, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
Frederick WOLF and Hilde Wolf, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 Nos. 6743-6746.
 United States Court of Appeals Tenth Circuit.
 November 1, 1961.
 Rehearing Denied December 8, 1961.
 
 Stanley L. Drexler, Denver, Colo. (Ellis J. Sobol and Melvin A. Coffee, Denver, Colo., on the brief), for petitioners.
 Nathan J. Paulson, Attorney, Department of Justice, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen. and John B. Jones, Jr., Lee A. Jackson, and Daniel K. Mayers, Attorneys, Department of Justice, Washington, D. C., on the brief), for respondents.
 Before LEWIS and BREITENSTEIN, Circuit Judges, and CHILSON, District Judge.
 BREITENSTEIN, Circuit Judge.
 
 
 1
 The petitioning taxpayers, husband and wife in each instance, contend that payments made to the husbands in the tax years 1955, 1956, and 1957 by Shell Chemical Corporation are nontaxable gifts under § 102(a) of the 1954 Internal Revenue Code.[1] The Commissioner of Internal Revenue ruled to the contrary and his decision was sustained by the Tax Court.
 
 
 2
 The circumstances in which the payments were made are of controlling importance. In 1947 Julius Hyman, an officer of Velsicol Corporation based in Chicago, developed an insecticide known as chlordane and became involved in a dispute with Velsicol as to the rights to that product. Hyman, believing chlordane to be his property, came to Denver with about 40 Velsicol employees, organized a corporation named Julius Hyman & Company, and began the manufacture and sale of insecticides. Velsicol brought suit and was successful in establishing its rights to chlordane. During the pendency of that litigation, Julius Hyman & Company developed two new insecticides known as aldrin and dieldrin and entered into a contract with the Shell Chemical Corporation whereby Shell became the exclusive sales agent for aldrin and dieldrin in the United States. Velsicol asserted its right to these two products and brought another lawsuit which on March 17, 1952, ended with a decision in favor of Velsicol.
 
 
 3
 After that decision Shell acted promptly to protect its interests. It agreed to buy all the stock of the Hyman company provided that a settlement suitable to Shell could be negotiated with Velsicol and that at least 95% of the Hyman company stock would be committed for sale by April 30, 1952. Each of these provisos was met by about the middle of April and before the end of that month Shell acquired all the Julius Hyman & Company stock.
 
 
 4
 Of the 750-800 Hyman company employees at that time, 29 remained of the original group which had come with Hyman from Chicago. Each of them had invested his own money in Julius Hyman & Company stock and had devoted his efforts to the success of that company. Shell would not agree to retain any of the group as employees after its acquisition of Julius Hyman & Company. An officer of the Hyman company suggested to Shell that this group was deserving of special consideration. Shell determined unilaterally to pay to this group of 29 an amount equal to one-half of one per cent of its gross sales of aldrin and dieldrin. The payments were to be made in Shell's discretion. The record indicates that Shell expected that the payments would last no more than 5 years and would not exceed a total of $300,000. The division of this money among the 29 distributees was in accordance with a formula delivered to Shell by an officer of Julius Hyman & Company.
 
 
 5
 The group of 29 was made up of a purchasing agent, two welders, four chemists, two entomologists, a bookkeeper, a registered pharmacist, a storekeeper, an advertising man, a chemical engineer, an accountant, a sales manager, two salesmen, a chemist serving as treasurer, two research chemists, four maintenance foremen, an engineer, an instrument man, a civil engineer, and a lawyer.[2] The facts which distinguished the members of this group from the other employees of Julius Hyman & Company were that they had given up jobs with Velsicol with the loss of whatever security was attached thereto, cast their lots with Hyman, moved to Denver, invested some of their savings in Julius Hyman & Company, tied their future to the success of that company, and, by the sale of their stock, lost the opportunity to profit by the future growth of that company.
 
 
 6
 On April 29, 1952, the president of Shell wrote each of the 29 notifying him of the intent of Shell to distribute to the members of the group for an unspecified time an unstated portion of the proceeds from the aldrin and dieldrin sales. The letter read in part:
 
 
 7
 "* * * we realize it will be necessary for us to draw upon the information and experience of many of the people who have been associated with the company's past operations. * * * We should like to be free to consult and advise with any of you from time to time on such problems as may arise * * *."
 
 
 8
 A Shell official testified that this letter was written because Shell was undertaking a new operation which involved a secret process about which Shell knew nothing and "We decided it was very important that we keep the people that were most interested in the operation * * * on our side. We wanted them to feel that they had a very definite interest in the success of these two products." Shell charged payments to the distributees as ordinary business expense and returned information forms 1099[3] showing the payments as having been made as "Salaries" or "Rents and Royalties." None of the minutes of stockholders or directors meetings of either the Hyman company or Shell contain any discussion of or authorization for the payments in question.
 
 
 9
 On July 15, 1958, the manager of the Shell Tax Department wrote the District Director of Internal Revenue at Denver that:
 
 
 10
 "* * * [Shell] wanted to show its appreciation to twenty-nine employees of Julius Hyman & Company most closely associated with the former management and success of that company * * * by rewarding them for their past contributions in the development of these two products. * * * Shell Chemical Corporation was under no obligation to make the payments and intended that they be regarded as gifts to the recipients."
 
 
 11
 None of the 29 were employed by Shell or a subsidiary of Shell prior to April 30, 1952, and whatever contribution any of them might have made to the two products was not the result of any employment by Shell or any incentive offered by Shell. After that date Shell never consulted with or utilized the services of any of the 29 except of those whom it retained in its employment.
 
 
 12
 Thirteen of the group in question remained as employees of Shell during the 5-year distribution period. Of the remainder, two died and one accepted employment with a competitor. Shell continued payments to all of the group. In the case of the dead distributees Shell honored without question check endorsements by the surviving widow of each. After the determination by the Commissioner that the payments were taxable income, 11 challenged the Commissioner's decision by seeking review in the Tax Court and 4 have appealed from the adverse decision of that court.
 
 
 13
 The decision in Commissioner of Internal Revenue v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218, is controlling. There it was held that the proper criterion to be applied in determining whether a gift was made is the basic reason in fact for the action of the transferor. We followed Duberstein in United States v. Kasynski, 10 Cir., 284 F.2d 143.
 
 
 14
 The Tax Court held that the transfers did not result from "`a detached and disinterested generosity' springing from `affection, respect, admiration, charity or like impulses'" but proceeded primarily from "`the constraining force of [a] moral or legal duty' or from the incentive of anticipated benefits of an economic nature."
 
 
 15
 We are not impressed by the negative holdings of the Tax Court. It is difficult to understand how a corporation for profit can transfer property out of a detached and disinterested generosity arising from affection, respect, admiration, charity or like impulses. These are personal emotions to which a corporation is not subjected, even vicariously. Yet the court in Duberstein rejected the government contention that as an ordinary matter a payment by a corporation cannot be a gift. We agree with counsel for the taxpayers that there may be a business motivation for a gift and that in the case of corporations the personal-emotions test is inapplicable.
 
 
 16
 The Tax Court holding that the payments were made because of the force of a moral or legal duty is without support in the record. There is nothing to establish any moral or legal duty owed by Shell to any of the 29 and there is nothing on which a reasonable inference thereof may be based.
 
 
 17
 The validity of the Tax Court decision depends on its holding that Shell made the transfer "from the incentive of anticipated benefits of an economic nature." This finds support in the Shell letter of April 29, 1952, the testimony of the Shell official that Shell thought it important to keep the group "on our side," and the tax treatment which Shell gave the payments. True it is that there is countervailing evidence of persuasive nature. We find it difficult to understand how Shell could expect any economic benefit from consultation with welders, storekeepers, maintenance men, and others who made up the group of 29. The two dead men and the man who accepted employment by a competitor could not contribute anything to Shell and yet Shell continued to pay. Shell never sought the advice of the 29 and yet by 1955, the first year involved here, had completed three years of successful production of the insecticides. Shell was not bound to pay during the three years in question and yet it continued to do so. The statements by Shell in the April 29, 1952, letter, the Shell official's explanation of that letter, and the tax treatment of the payments by Shell might well have stemmed from a desire to avoid ultra vires interpretation of the act rather than a real anticipation of any economic benefit. It might well be concluded that Shell made the payments without thought of requital.[4]
 
 
 18
 However, Duberstein lays down the rule that in a case such as this appellate review is "quite restricted."[5] The findings of the Tax Court must be accepted unless clearly erroneous and we may not substitute our inferences for those of that court.[6] The Tax Court has here found that the causation or compelling motivation for the transfer was economic benefit to the transferor. There is substantial evidence from which this conclusion can be drawn. As we read Duberstein, it is not within our power to change the result.
 
 
 19
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 26 U.S.C. § 102(a)
 
 
 [2]
 So far as the petitioners herein are concerned, Joshel was a chemist serving as treasurer of Julius Hyman & Company, Silber was a lawyer, and Nelson and Wolf were each maintenance foremen
 
 
 [3]
 United States Treasury Forms No. 1099
 
 
 [4]
 See Bogardus v. Commissioner of Revenue, 302 U.S. 34, 45, 58 S.Ct. 61, 82 L. Ed. 32 (dissenting opinion)
 
 
 [5]
 363 U.S. 290, 80 S.Ct. 1190, 4 L.Ed.2d 1218
 
 
 [6]
 363 U.S. 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218: United States v. Kasynski, supra, 284 F.2d p. 146